## UNITED STATES v. MILLER.

District Court, S. D. New York.

June 28, 1945.

John F. X. McGohey, U. S. Atty., of New York City (Charles J. Wagner, Asst. U. S. Atty., of New York City, of counsel), for plaintiff.

Samuel W. Altman, of New York City, for defendant.

MOSCOWITZ, District Judge.

This is a motion made by the defendant, Frank L. Miller, for an order vacating and setting aside the judgment of conviction entered herein in the office of the clerk of this court on March 8, 1944, setting aside the verdict of the jury herein, and granting to the defendant a new trial on the ground of newly discovered evidence. The basis of the motion is that the judgment of conviction was obtained by means of perjured testimony and that the government suppressed material evidence.

The defendant, Frank L. Miller, and Odie V. Fluker, alias Eddie Leddell, Matthew A. Reinhardt, alias Arthur Rehn, Benjamin Franklin Clifton, Jr., Paul Samuel Martoccia, Harold LeRoy Butler, alias Jack Butler, Daniel Spencer Moran, alias "Spence," Albert J. Contento, alias Al Howard, John Jay O'Brien, alias Jack O'Brien, Joseph W. Grober, George A. Turley, alias Mr. Johnson, Russell Safferson, and Sigmund Saxe, were indicted by the Grand Jury upon three counts. The first count charged that between May 11, 1942, and the date of the filing of the indictment the defendants transported and caused to be transported in interstate commerce from the City of Daytona Beach, Florida, to the City of New York, New York, securities of the value of over $5,000 which had theretofore been stolen. The second count charged that the defendants did receive, conceal, store, barter, sell and dispose of these securities. The third count charged a conspiracy to transport and cause to be transported the stolen securities. Nine of the defendants pleaded guilty to the indictment.

The trial against the defendants Miller, Grober, Safferson and Saxe commenced on February 1, 1944. On February 24, 1944, the jury returned a verdict of not guilty against Grober, Safferson and Saxe and found the defendant, Miller, guilty on the three counts of the indictment. On March 8, 1944, he was sentenced. Miller appealed to the Circuit Court of Appeals. Before decision, the Circuit Court of Appeals remanded the cause to this Court so that it might entertain and determine this application made by Miller to set aside the conviction. The Assistant United States Attorney stated that he would not object to remanding the cause, without conceding the truth of the charges contained in the moving papers, so that this motion could be heard.

The basis of the motion is that the defendant, Contento, who pleaded guilty and testified as a government witness, committed perjury upon the trial. Undoubtedly Contento was an important witness and it is doubtful whether there could have been a conviction without his testimony. Contento's criminal record prior to the time he pleaded guilty in this case, upon which a sentence of three years imprisonment was imposed, was as follows:

B), signed by Contento, the pertinent portions of which are as follows:

" * * * Both D. A. Reis and the agents were with me one hundred per cent during every day of the trial and they assured me I will be back in the U.S.M.M.S. right after the trial was over. * * *"

The second was dated June 20, 1944 (Exhibit C), signed by Contento, the pertinent portions of which are as follows:

" * * * I was assured the same sentence as the Chief of Police of Daytona Beach, Florida. The same day I pleaded guilty he did the same and was released into the Army. * * *

" * * * the night of the verdict they all expressed their opinion that I could get ready for sea duty real soon. * * *"

The third was dated July 10, 1944 (Exhibit D), signed by Contento, the pertinent portions of which are as follows:

" * * * I was prompted a week before trial daily by Asst. U.S.D.A., Mr. Samuel Reis, and agents Keating and his partner, and induced that when I took the stand and if asked if the U. S. District Attorney office or F.B.I. had promised me anything for testifying to say 'no' promises had been made to me; in addition I had to

"Criminal Record: FBI No. 273134. New York City Police Department No. B–15046.

| Date | Place | Offense | Disposition |
| --- | --- | --- | --- |
| 1/16/08 | New York City | Asslt. & Robbery | Discharged 1/19/08 |
| 1/8/16 | " " " | Narcotics | Served 3 yrs. and 3 mos. U. S. Penit., Atlanta, Ga. |
| 11/21/27 | " " " | Indicted with others on S. S. 'Trader' case | Acq. by jury 1/1928 |
| 4/5/30 | U. S. Dist. Crt. New York City | Using mails to defraud | S. S. Probation for 2 yrs. |
| 5/31/35 | U. S. Dist. Crt. New York City | Transp. property which was stolen in interstate commerce | Nolled. |
| 3/25/36 | New York City | Viol. 887 C.C.P. | not given |
| 1/28/38 | Nacional Bureau of Ident. Habana, Cuba | Inquiry | not given |

Contento freely admitted his criminal record upon the trial.

Fred Kaplan, Esq., was the attorney for Contento at the time he pleaded guilty. Attached to the moving papers are a telegram sent to Mr. Kaplan by the wife of Contento on March 17, 1944 (Exhibit A), also three letters, one, dated April 7, 1944, (Exhibit

change part of my original statement, to work out with their other evidence, please have the judge check my original statement and this will bear me out.

"When you told me of your implicit confidence in Asst. U.S.D.A. Mr. Samuel Reis and to go ahead and trust him because you knew him so many years and He keep his.

promise with the Chief of Police of Daytona, So why, should he cross me. You knew how I argue with you about taking the stand anyway you telephoned the Agents from your Hotel and after a long conversation you told me to go ahead and do whatever the Asst. U.S.D.A. Mr. Samuel Reis told me and his word was his bond.

"He told me I would be on the Street thats his word (Street) soon after the trial. My letter to the Judge is all fact and truth, please get those facts into your affidavit. * * *"

█ Contento has made a motion for the reduction of his sentence. Mr. Kaplan no longer represents him. His present counsel strenuously objected on the hearing to the consideration by the Court of the telegram and letters, Exhibits A, B, C and D, upon the ground that they were privileged communications between a client and his attorney, and that Mr. Kaplan was guilty of unprofessional conduct in delivering the telegram and letters to Miller. The fact is that the telegram and letters have been made public, as they are part of the motion papers; the question of whether or not Mr. Kaplan was guilty of a violation of his obligation to his client is not before the Court and this Court therefore expresses no opinion relating thereto.

The Court conducted hearings upon this motion and received testimony on May 18, 1945, and on June 6, 1945. At such hearings Contento emphatically denied that either Mr. Reis, the Assistant United States Attorney who tried the case, or the Special Agents of the Federal Bureau of Investigation, made any promises whatever to him. Testimony was given to this same effect by Mr. Kaplan, Mr. Reis, Mr. Joseph D. Milenky, Special Agent of the Federal Bureau of Investigation, and Mr. John J. Keating, the other Special Agent of the Federal Bureau of Investigation. There was not the slightest evidence in this record indicating that any promises whatever were made by Mr. Reis or Agents Keating and Milenky to Contento. Contento testified that his attorney, Mr. Kaplan, did make certain promises to him. He testified that the statements in the letters concerning promises were untrue, that he wrote these letters "to try to get out of jail." He testified that his purpose was to induce Mr. Kaplan, who had not answered his communications, to take some action in his behalf. Contento had stated in the letters that he was promised the same sentence as the Chief of

Police of Daytona received, which was a suspended sentence. Mr. Kaplan testified that he had no conversation with Contento "in which I told him he would get the same sentence as the Chief of Police in Daytona." It appears, therefore, from all the testimony that no promises were made to Contento by Mr. Reis, or by Special Agents Keating or Milenky and that any statements contained in the telegram or letters which tend to reflect on Mr. Reis, Mr. Keating or Mr. Milenky are without the slightest foundation.

There is a more serious aspect to this case. Contento's testimony weighed heavily against the defendant, Miller; it is unlikely that there would have been a conviction without it. There is no question but that the securities were stolen in Florida and transported to New York. The serious question so far as Miller was concerned was whether he had knowledge that the securities were stolen and Contento's testimony was offered to bring knowledge home to Miller. Undoubtedly Mr. Reis, Mr. Milenky and Mr. Keating sincerely believed that Contento's testimony at the trial was truthful. Under those circumstances, can it be said that the Assistant United States Attorney was under an obligation to voluntarily present to the court three statements which he had in his possession made by Contento prior to the trial which contained contradictions, many of which were of a vital character?

Contento made these three statements to the Federal Bureau of Investigation, dated February 3, February 24 and February 25, 1943, respectively. These statements contained vital contradictions of his testimony at the trial. Counsel for Miller did not request the Assistant United States Attorney to produce these statements, although Contento testified that he had made statements. Is an Assistant United States Attorney required to voluntarily present to the court for its inspection statements in his possession which are contradictory to the testimony of the witness when the prosecutor believes that the testimony given by the witness is truthful? See United States v. Krulewitch, 2 Cir., 1944, 145 F.2d 76; United States v. Cohen, 2 Cir., 1944, 145 F.2d 82; United States v. Ebeling, 2 Cir., 1944, 146 F.2d 254; United States v. Simonds, 2 Cir., 1945, 148 F.2d 177; United States v. Cohen, 2 Cir., 1945, 148 F.2d 94. That question need not be answered in view of the fact that upon the argument of this mo-

tion the United States Attorney voluntarily produced the three statements made by Contento and they are therefore before the Court.

Falsifying is not new to Contento; he falsifies to suit his convenience. His testimony at the trial brought home knowledge to the defendant Miller that the securities were stolen. The letters to his attorney were to the effect that he was promised consideration by the United States Attorney and representatives of the Federal Bureau of Investigation, and that he was instructed to say "no" when asked if he had received any such promises. He also stated in these letters that he had changed parts of his original statements "to work out with their other evidence." On the trial Contento testified that he saw defendant O'Brien who was short of funds, that he advanced some money for O'Brien and obtained a list of the securities and delivered the list to Miller and that Miller "brought me over to Turley" another defendant. O'Brien first informed Contento that the securities had been obtained in a crooked gambling game from a refugee who had smuggled them in. Contento testified that when he gave Miller the list he repeated the story about the bonds, "the story O'Brien had told me." He then testified that when he first brought the list to Miller he informed Miller that "they were lost in a phony gambling game in Florida, that I could buy them very cheap, 25 per cent." He further testified:

"Q. Did you tell him whose bonds they were? A. No.

"Q. Did you tell Miller anything about a refugee smuggling them in? A. Yes, I did.

"Q. You did tell him that? A. Yes.

\* \* \* \* \* \*

"Q. You told him the story about how the bonds were obtained? A. Yes.

"Q. Is that your statement? A. Yes.

"Q. What did Miller say to you when you brought him that list? A. We had them looked up to see if they were negotiable, and any reports on them, if they were not. That was the language we used.

"The Court: Who do you mean by 'we'?

"The Witness: Meaning Mr. Miller and myself."

The three statements made to the Federal Bureau of Investigation are in question and answer form. In Contento's first statement on February 3, 1943, he stated that when he went to see Miller he informed him that the bonds could be bought for 25 per cent of their value but that Miller said that he could dispose of the bonds. In speaking of the origin of the bonds in the statement of February 3, 1943, he stated at page 11:

"A. I told him that story that I had gotten from O'Brien that a refugee had brought them into the country and they were frozen and he paid off a bet in Florida and that was the reason I could get them so cheap. So therefore I said if there was any jeopardy, if the story was not correct I didn't want to be bothered with it and to check it and he in turn brought me to Mr. Turley's office.

"Q. You fully explained to Miller that the bonds were tainted, is that right? A. That they were tainted in that respect, yes.

"Q. And Miller said he had someone he could get to get rid of them fast? A. Yes.

"Q. Did he at that time tell you who that party was? A. No, just a lawyer.

"Q. Did you ask him who the lawyer was? A. He told me Turley.

"Q. Did you ask him who Turley was? A. Yes.

"Q. What did he say about Turley? A. He said a prominent lawyer with a good reputation who had been in that business for years."

The following appears in Contento's statement of February 24, 1943, at page 6:

"Q. Did you ever tell Miller about the man at the hotel? A. No.

"Q. Are you sure? A. Positive. I never told Miller anything about it. I didn't want Miller to know where I was getting any of that stuff.

"Q. Did you tell Miller that the stuff had been stolen from an automobile? A. No, I told Miller the first story about the refugee stuff. It was taken off a refugee in a gambling game, that was the original story going around the Sutton Hotel, and all the bars will tell you, because O'Brien became very conspicuous. He was trying to cash the coupons around the different bars."

The statement of Contento made on February 25, 1943, contains the following:

"Questions by Mr. Reis

"Q. Did you at any time mention Paul's name or O'Brien's name to Miller? A. No, I didn't. I had that out with him be-

fore. I probably did not mention either one of their names to Miller.

"Q. Did you ever tell Miller at any time that the source of your supply was somebody out of the state? A. Yes, I told Miller it was from Florida. I told Miller the first story O'Brien had told me, the refugee story with the refugee losing money in a gambling house and paying off in bonds, the bonds were smuggled into the country, that they were frozen.

"Q. Did you ever tell Miller another story after you were told by Paul that they were stolen out of an automobile? A. Well, it was weeks afterward that I mentioned the stuff was stolen.

"Q. Who to? A. Miller.

"Q. Where, in Miller's office? A. Yes. There were the two stories, I said, I don't know which to believe.

"Q. When you told Miller about the bonds being stolen from an automobile, what did Miller say? A. He didn't say anything.

"Q. He didn't say a thing? A. Well, he mentioned, I mean by that, you see we referred to these things as hot. I have to change my whole language.

"Q. I don't want to change any language, I simply would like to know the facts? A. Well, it stands to reason that if this stuff is legitimate, I would go and trade it in a broker's office myself.

"Q. You made a statement that it was always referred to as hot. Who mentioned that? A. Turley, Miller and myself.

"Q. Did you ever use the word hot when the three were in discussion together? A. Yes. Because of the fact that I was giving Turley 30 per cent to turn them over.

"Q. I want to know did you ever tell Miller that you had been told another story by Paul that the bonds had been stolen from an automobile? A. Well, I couldn't say that. I couldn't say that.

"Q. You just made a statement a minute ago that there were two stories. They were hot bonds a refugee had lost gambling, then you found out they were stolen. Did you ever tell Miller they were hot? A. No. My story with Miller was that first refugee story.

"Questions by Mr. Milenky

"Q. After you had already gone into the deal, did you ever tell Miller that story about their being taken from an automobile? A. That part of the thing was dead, because there was no money and—

"Q. Did you tell Miller that story Paul had told you about their being stolen from an automobile? A. That, I couldn't say. I may have mentioned it to him.

"Q. Did you mention it? A. I must have mentioned it because I mentioned it to Turley.

"Q. You mentioned it to Turley? A. Sure, he was the source of disposing of the stuff. I wasn't interested in Miller. I mentioned it to Turley.

"Q. When you told Turley they were stolen what did Turley say? A. That was another thing Paul said. They were stolen out of an automobile, but the owner of the automobile was a refugee who couldn't make a complaint.

"Q. In other words you told Turley a story that the bonds had been stolen out of an automobile which belonged to a refugee, and the refugee couldn't complain about the theft of the bonds because he had smuggled them in? A. That's right. Because they were frozen.

"Q. When you told Turley they were hot, what did Turley say? A. Well, Turley had a week to look them up, and he found nothing wrong. He said I can get rid of them. He said it makes no difference how hot they are.

"Q. Does that refresh your recollection as to whether or not you told Miller the same thing that you told Turley? A. I told Miller the same thing that I told Turley because of the fact * * *. This will bear me out, the fact that Miller was trying to promote somebody to advance 15, 10 or 15 hundred dollars for me to go to Florida to buy him some more. This stuff was supposed to be taken from a refugee. One was the gambling story. One was the story of Paul that they were taken from a trunk of an automobile, that the owner was a refugee. That they couldn't make a complaint. That they were frozen.

"Q. Do you know what sources Miller was trying to raise 10 or 15 hundred dollars for your trip to Florida to get more bonds through? A. Find out from Moran. He brought in a banker, an ex-partner of his, unbeknown to me. One morning he made an appointment for me to meet an ex-associate of his.

"Q. Who was that partner? A. Shapiro, Moran's ex-associate.

"Q. Now, you are sure you told Miller both stories? A. Yes, he had both stories. You can check this with Shapiro.

"Q. Where is Shapiro now? A. You can find out from Moran.

"Did you and Miller and Shapiro have a conversation about it? A. The four of us, including Moran.

"Q. Where? A. In Miller's office.

"Q. What was said by you, what was said by Miller, what was said by Moran and what was said by Shapiro? A. You would have to get the four of us together.

"Q. Well, to the best of your recollection? A. Moran promoted, tried to promote his former partner.

"Q. Well, what did he say? A. He said he could get me all the funds I need.

"Q. Through Shapiro? A. From Shapiro.

"Q. In Shapiro's presence. A. Yes.

"Q. What did Miller say? A. The meeting was arranged there for me. You see, Moran is Miller's friend.

"Q. What did Miller say? A. Miller made this arrangement for me to meet Shapiro through Moran in his office.

"Q. In Miller's office? A. In Miller's office.

"Q. What did Miller say that day when the meeting was already on? A. Here's a man who will finance, finance you in going down and picking up some more of that South American bonds. So Shapiro, who Moran had brought in, wanted to get more particulars, from me direct, and he would let Moran know. See, the following day, he would let him know just how much money he could raise for such an adventure.

"Q. When did this take place? A. In Miller's office. What was the last bond sale?

"Q. Around August 4th? A. After August 4th. Between August 4th and August 30th. Whozit would be more accurate on the date. Moran would be more accurate.

"Q. It was after the last six bonds had been sold? A. After the last transaction.

"Q. That is the last South American transaction? A South American transaction.

"Q. And did you hear from Shapiro the next day? A. I wasn't supposed to hear from Shapiro. I would meet with Moran in Miller's office.

"Q. Was Miller there? A. Yes.

"Q. What happened? A. He stated Moran stated that he could not get the amount of money I wanted for a big deal, but that he would get between 1500 and 2,000, you see, and then we could pyramid our proceeds, so I says no dice, I wasn't interested either I would make one trip and make it worth while or I would wait, you see.

"Q. And nothing came of that? A. This fellow couldn't get the money. He could only get $2,000."

There are many other contradictions of a like character pointed out in defendant's brief. The Court is unable to determine what effect it would have had on the jury had they known of these contradictory statements made by Contento—it may have changed the result. While Contento now testifies that the testimony he gave upon the trial was truthful, nevertheless it is difficult to determine where the truth lies in view of the contradictory character of his statements before trial, his testimony upon this motion, the telegram and the letters which he wrote to his attorney, which he now claims to be false and which he says he intended that his attorney should present to the court on an application to modify his sentence.

What the Court said in Martin v. United States, 5 Cir., 1927, 17 F.2d 973, 976, to some extent applies here:

"In our opinion it is the duty of a trial court to grant a new trial, where a witness at the original trial subsequently admits on oath that he committed perjury, or even that he was mistaken in his testimony, provided such testimony related to a material issue, and was not merely cumulative. * * * There is no way for a court to determine that the perjured testimony did not have controlling weight with the jury, and, notwithstanding the perjured testimony was contradicted at the trial, a new light is thrown on it by the admission that it was false; so that, on a new trial, there would be a strong circumstance in favor of the losing party that did not exist, and therefore could not have been shown, at the time of the original trial."

Also in Di Carlo v. United States, 2 Cir., 1925, 6 F.2d 364, 368:

"The possibility that the jury may accept as the truth the earlier statements in pre-

ference to those made upon the stand is indeed real, but we find no difficulty in it. If, from all that the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court. There is no mythical necessity that the case must be decided only in accordance with the truth of words uttered under oath in court."

Also in United States v. Senft, D.C.N.Y. 1921, 274 F. 629, 630:

"* * * I am of the opinion that the defendant 'should be allowed an opportunity to present his case to the jury upon the facts as they exist,' as was said in People v. Friday, 83 Hun 240, 31 N.Y.S. 399. The jury is supposed to hear the truth and the whole truth. They were not afforded this opportunity when Daly was offered as a witness, for they were justified in accepting his testimony as given by a witness who could not be discredited because of any act that he had previously committed. Obviously they were mistaken, if they accepted his testimony upon such a belief.

"Trials are conducted, under the direction of the court, in a search for the truth. A motion for a new trial, which is peculiarly addressed to the discretion of the court, should be granted, where it appears that such an important fact as was here involved was not known to the jury * * *."

The defendant's attorney did not request the Assistant United States Attorney to produce Contento's statements. He evidently relied upon the procedure existing at that time whereby if he requested the production of the statements and they were produced, they could then be offered in evidence. This was however changed in United States v. Krulewitch, supra, which was decided August 1, 1944, subsequent to the trial of this action. This Court in the case of McCarthy v. Palmer, 1939, 29 F. Supp. 585, seriously criticized the federal rule as it then existed in contrast with the New York rule.

■ Grave responsibility rests upon a court in setting aside a verdict of a jury, one which should be exercised with great care and caution. Here bringing home knowledge that the securities were stolen rests squarely upon the testimony of Contento who either committed perjury at the trial or made a false statement to his lawyer which was to be used upon his application to the court for reduction of sentence.

Furthermore, the statements made by him to the Federal Bureau of Investigation contradict his testimony in vital respects.

It is only fair to say that the evidence indicates that Mr. Reis, Mr. Keating and Mr. Milenky acted honorably and the disposition of this motion does not reflect in the slightest upon them.

Motion to set aside the verdict is granted and a new trial ordered. Settle order on notice.